### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | 8:04CR461 |
| vs. | ) | |
| | ) | **REPORT AND** |
| JUAN CARLOS VERA, | ) | **RECOMMENDATION** |
| | ) | |
| Defendant. | ) | |

This matter is before the court on the defendant's Amended Motion to Suppress [32]. The motion was heard on March 25, 2005. The transcript of the proceeding [50] was filed on April 14, 2005 and the matter was deemed submitted.

The defendant, Juan Carlos Vera, moves the court for an order suppressing all evidence obtained during his September 26, 2004 detention and the subsequent search of his motor vehicle. Specifically, he alleges the detention, search, and his statements occurred without probable cause or consent, all in violation of his rights under the Fourth Amendment to the United States Constitution. It is the government's position that this contact was consensual. (131:20-134:12).

For the reasons discussed herein, I recommend that the motion be denied.

### FACTUAL BACKGROUND

William Maddux testified he has been employed by the Seward County, Nebraska Sheriff's Department since June of 2004. Prior to that time, he worked as a law enforcement officer in the state of Kansas for seven years. On September 26, 2004, while on duty, he had

contact with Juan and Angel Vera at a rest area off Interstate 80 near Milford, Seward County, Nebraska (7:1-16).  At about 7:00 a.m., Maddux first observed a green car, a Grand Prix, parked in the Milford rest area. He believed this was the only vehicle in the rest area at that time.  As he pulled his vehicle next to the green vehicle the driver of the green vehicle, later identified as Angel Vera, suddenly sat up and looked at Maddux (8:8-25).  It appeared that the driver had been laying down with his seat reclined when he "popped up." (9:11-16).  Maddux exited his patrol vehicle and walked to the driver's side of the green vehicle.  He waved at the driver and the driver waved back and rolled down his window (10:11-17).  Maddux observed another occupant, later identified as Juan Vera, on the passenger side, laying down with his seat reclined (11:7-12).

  Maddux testified he then stated in English, "Hey, how's it going?"  Angel replied in Spanish and Maddux asked if the parties spoke any English.  Juan said, "I speak pretty good English." (11:17-25). Maddux asked Juan if he wouldn't mind stepping out of the car so that Maddux could talk to him for a few minutes and Juan responded, "Yeah," opened the car door, and walked to the front of the vehicle (12:1-22).  At the front of the vehicle, Maddux asked Juan if he had a driver's license.  Juan stated yes, that he did (12:23-25).  Maddux asked Juan if he would mind if Maddux looked at the driver's license.  Juan gave Maddux his license.  Maddux then asked Juan if he'd mind having a seat in the patrol car while Maddux looked at the license. Juan responded, "Yeah," or acknowledged yes in some form.

Maddux and Juan then went to Maddux's cruiser, where Maddux occupied the driver's seat and Juan sat in the front passenger seat (13:24-14:9).

Maddux testified that in the patrol car he reviewed Juan's driver's license and noted it was a California license. He then asked Juan where he was heading and Juan told him California (15:7-12). Maddux asked Juan if he was going to California why he was in a rest area off the eastbound lanes of Interstate 80. Juan told Maddux that the other person in the car was his father and they had been visiting an uncle in Omaha and were on their way back to California. The night before they had gotten off at the 397 Exit to get gas and to switch drivers, and his father, Angel, had gotten on the wrong ramp when he re-entered the Interstate. Once they ended up eastbound they decided to stop in the rest area to sleep and wait until morning to turn around and head back to California (15:23-16:19).

Juan also informed Maddux that the pair had been visiting in Omaha for two weeks with his dad's brother, who Juan said was "a farmer or something like that," and that they stayed at the uncle's house. Maddux asked Juan what they had done during the visit, and Maddux noted that Juan never gave him a straight answer (16:23-17:10).

Maddux asked Juan who the vehicle belonged to. Juan stated the vehicle was his and that he had owned it for two years. Maddux returned Juan's driver's license and asked him if he had any large amounts of U.S. currency or money in the vehicle. Juan replied that he

had $200 or $300 but that was all.  Maddux asked him if there was any marijuana, cocaine, methamphetamine or heroin in the vehicle.  Juan stated, "No." (18:4-10).

Maddux testified he was concerned about the inconsistencies and vagueness of the conversation, however before he could ask for permission to search, Juan told him that he could look in the car if he wanted and Juan started to hand Maddux the keys to the car.  Maddux asked Juan, "So are you giving me permission to search your vehicle?" Juan said, "Yeah."  Maddux took the keys and asked Juan if he would mind staying in the patrol car while the vehicle was searched.  Maddux does not remember whether or not Juan said okay, but Juan did remain in the patrol car (19:3-18).  Maddux then exited his vehicle, again approached the Vera vehicle, and motioned to Angel to come out of the car (19:19-23).  Angel exited the vehicle and Maddux patted Angel down and walked him to a nearby trash dumpster (20:1-5).  Maddux then returned to the Vera vehicle, popped the trunk of the vehicle and, based upon his past experience, observed what he believed to be a false compartment behind the back seat (20:21-21:10).

Maddux testified that he is familiar with this type of Grand Prix and knows when you look in the trunk you can see the back seat through the trunk (21:17-23); however, on this vehicle he saw two pieces of what looked like after-market painted metal on each side of the interior of the trunk . In his experience, this material was not factory (21:24-25:4).  He then removed the luggage and observed the trunk walls where he noted a piece of wood or

something like plywood. He went to the inside of the car, pulled the bottom of the backseat out, and noted the bolts holding the backseat on where shiny and it appeared to have been recently removed and "wrenched on." He attempted to remove the bolts but he did not have the proper tool. He was, however, able to pry the side of the back seat forward and with his knife cut a rubber housing, exposing a kilo-sized package of what appeared to be contraband. Further examination disclosed a total of ten such packages (22:6-23:12).

Maddux testified that as soon as he found the package he had other officers, who had earlier arrived at the scene, place Angel in custody while he placed Juan in custody and handcuffed him (24:10-14). Maddux informed Juan of his *Miranda* rights in English, as Juan had been able to carry on a conversation in English and Juan appeared to be "very fluent" in English and had no problems speaking in English. He asked Juan if he understood the rights, Juan said, "Yes." (25:23-26:4). After pictures were taken of the vehicle, Juan was transported to the Seward County jail by Maddux. During transport Juan asked if Maddux could do him a favor, that Juan's dad didn't know anything about what was in the vehicle and just thought the pair were on a vacation. Maddux replied, so what is the favor, Juan stated to let his father go or not get him in any trouble. Maddux took Juan to the Seward County jail and Angel was transported by Officer Bryce Johnson of the Milford police department (26:6-27:12).

On cross-examination Maddux testified he arrived at the Milford rest area at about 7:00 a.m. and it is his recollection that there were no other vehicles in the rest area (32:2-6).

He admitted that when he pulled into the area the vehicle, he later determined to be the Vera vehicle, had California plates (32:18-21) and was legally parked (35:13-15). He also admitted that while his training identified California as a drug-source, it really didn't mean that much because any state could be a drug-source (35:25-36:24).

On cross-examination Maddux further testified he drove up to the east side of the Vera vehicle and looked to his right to observe the vehicle (37:8-16). He also stated that when he first saw Angel they were about ten feet apart and he could tell Angel was a Hispanic male (39:5-17). As he walked up to the Vera vehicle he did not remember if he or Angel waved first, but that they did wave at each other (40:22-41:15). Maddux also stated that Angel rolled down the window to the vehicle and he denied that he knocked on the window (42:15-23). Maddux admitted that when he looked in the vehicle he did not see any guns, ammunition, cocaine, marijuana, heroin, methamphetamine, beer, marijuana pipes, bottles of wine, or anything indicating any illegal activity (43:21-44:20).

Maddux testified on cross-examination that Juan had a Spanish accent (45:9-13), but spoke in "normal, every day English" and was able to explain in English how he got off of the exit, switched drivers, ended up in the eastbound rest area, realized he was going the wrong direction, and how he was going to sleep in the rest area and turn around the next morning (47:15-22). Maddux denied using hand signals to direct Juan to exit the vehicle, stating he "just spoke in English to Juan" stating, "Do you mind stepping out so I can talk to you for a minute," to which Juan responded, "Yeah," and got out of the vehicle

-6-

(48:17-49:18). Maddux stated that after observing Juan's driver's license he asked Juan if he would mind having a seat in his patrol unit because it feels comfortable to be in his patrol unit and it is a habit he follows no matter who he encounters, whether they are Hispanic, black, or white (50:3-18).

Maddux testified on cross-examination that during his encounter with the Veras he was dressed in a uniform with patches on both shoulders which depicted him as a law enforcement agent. He also carried a gun and had a name tag and badge on his uniform. On his belt he carried a firearm on the right side, a pair of handcuffs up front, and a magazine with extra ammunition. He also carried a baton on the back of his belt and extra handcuffs on the back of his belt. Maddux described his cruiser as a silver Crown Victoria with yellow stripes on the sides with the wording "Seward County Sheriff" and a red, white and blue light bar mounted on top of the vehicle (52:19-54:17).

Maddux, on cross-examination, again testified that before he could ask Juan for consent, Juan volunteered his keys to the vehicle, after telling Maddux, "You can look if you want to." (56:24-57:7). Maddux then asked Juan if he was giving him permission to search the vehicle. Juan stated, "Yes," and Maddux took the keys (57:8-17). Maddux estimated that from the time he and Juan entered his patrol car until Juan gave his permission to search was three to five minutes (57:18-58:1).

Maddux testified on cross-examination that when he motioned for Angel to exit the vehicle he never had a conversation with Angel because it appeared to him Angel did not

-7-

speak English (59:2-16). Maddux estimated the dumpster was about 20 yards into the grass from the vehicle (59:17-60:11).

On cross-examination Maddux, after reviewing his report (Ex. 103), admitted that Juan did step out of the patrol vehicle while Angel and Maddux were by the dumpster and that he had motioned for Juan to get back in the vehicle. However, he denied yelling at Juan, stating that he does not yell at people in traffic stops, and that he told Juan, "I would appreciate it if you would remain in my vehicle for my safety and yours and if you need anything you can roll the window down, but please stay in my car." (61:3-65:7). Maddux stated that while he normally carries advisory forms in Spanish in his car, on this date he was driving another vehicle which did not have Spanish advisory forms. Maddux again stated he did not feel he had a language barrier with Juan, so he never looked for a Spanish advisory form (65:8-25). Maddux described both Juan and Angel as cooperative, and Juan as cheerful while in Maddux's vehicle (74:6-17).

Angel Vera testified on direct examination that he is the 58-year old father of Juan and that he is a resident of the United States and a citizen of Mexico having lived in the United States for more than twenty years (80:6-25). He testified that he speaks just a little bit of English and his native language is Spanish. He attended only the first grade in Mexico, cannot read Spanish, and can only write his name in Spanish (81:1-14).

Angel testified that on September 26, 2004 while in a rest area on the Interstate he was in the driver's seat of his son's car resting when Deputy Maddux came up to the car, knocked

lightly on the window and said something, then knocked harder (82:1-20). He testified that he was "pretty much asleep with his hand on his neck" and he jumped up and Maddux jumped back (85:18-22). Angel noted that it was "a bit dark, but wasn't real dark" (87:3-6). Maddux then spoke to Angel and asked him if he spoke English. Angel responded in Spanish that he did not understand English (87:7-20).

Angel testified that Maddux pointed to Juan and asked why Juan was lying down and asked if Juan spoke English. Angel replied, "Yes." (87:22-24). After Maddux and Juan spoke, Juan got out of the car and he and Maddux entered Maddux's patrol car (88:11-21). Angel testified that before Juan got out of the car, Maddux was "really angry" and shouted and gestured with his hand, for Juan to get out of the car (88:22-89:13). Angel testified that while in the patrol car Maddux and Juan seemed, from the way they moved their arms, to be arguing however, he could not tell what they were saying (89:22-90:1). Angel estimated that Maddux and his son were in the patrol car for approximately 8 to 10 minutes (91:8-11), during which time he observed they seemed to argue because the officer was waving his hands around (92:11-17). Angel then saw Maddux exit his cruiser and come towards the vehicle where Angel was seated, and Angel asked Maddux what happened. Maddux said shut up and got Angel out of the car by his shoulder (92:24-93:17). He asked for Angel's license and Angel showed him a license. He asked how much money Angel had and Angel showed him (93:20-23). As Maddux and Angel were standing outside of the car, Angel saw Juan try to get out of the cruiser and heard Maddux shout at Juan telling him not to move and

-9-

to keep his mouth shut. Juan got back in the cruiser and Maddux made a signal with his hands for Angel to move away from the car and to move next to a dumpster, telling Angel to stay there by gesturing with his hands (93:24-96:7).

On direct examination Angel further testified that when they first pulled into the rest area Juan was driving and he was asleep; however his son woke him up and told him he was tired and that they needed to switch places in the car (100:22-101:7). Angel then went to the bathroom and while returning to the vehicle noted that there were eight to ten cars in the rest area (101:5-23). He also testified that when Juan tried to get out of the patrol car, Maddux shouted at Juan and put his hand on his pistol (102:19-103:7).

On cross-examination Angel testified that he and Juan were traveling to Chicago (107:23-24).

Juan Carlos Vera testified that he is 29 years old and resides in Garden Grove, California. He is a citizen of Mexico who has legal papers to be in the United States and he speaks a bit of English; however, his primary language is Spanish (113:2-13). He completed 12th grade in California and can "more or less" read the English language (113:14-19). He lived in Mexico until the sixth grade when he moved to the United States at around fourteen or fifteen (113:22-114:4). On September 26, 2004 he was in a rest area sleeping when his father rubbed his shoulder and signaled him that a policeman was outside who wanted to talk with him (114:21-115:1). Juan observed Maddux standing outside of the vehicle, looked at him and heard him ask if he spoke English. Juan answered, "Yes."

Juan testified that Maddux, in an "authoritative voice," asked to see his license and requested that he get out of the car (115:21-23). Juan described an "authoritative voice" as one ordering him, with nothing about "please" or "allow me," and Maddux was not kind in any way (25:24-26:8). Juan got out, walked to the back of the car, and gave Maddux his driver's license (116:23-25). Juan stated that Maddux ordered him in a loud voice to get into the patrol car, which he did. At that time he observed approximately five to ten other cars in the rest area (117:6-19). While seated in the patrol vehicle, Maddux asked Juan questions about his driver's license (117:24-118:1).

Juan testified that Maddux then exited the patrol car and walked back to talk with Angel. He observed Angel get out of the car (118:7-15) and at that time he attempted to get out of the patrol car, when Maddux shouted, shut up, don't move and get back in the car (119:5-13). At the same time Maddux pointed one hand at him and put the other hand on his belt, as if to grab his pistol; however, Maddux did not remove the pistol from his holster. Juan got back into the patrol car (120:1-9).

## LEGAL ANALYSIS

Encounters between the police and citizens fall into three general categories: (1) consensual or voluntary encounters, which are not seizures and do not implicate the Fourth Amendment, *see, e.g., Florida v. Bostick*, 501 U.S. 429 (1991); *Florida v. Royer*, 460 U.S. 491 (1983); (2) investigative detentions, which are seizures of limited scope and duration within the meaning of the Fourth Amendment and must be supported by a reasonable

articulable suspicion of criminal activity, *see, e.g., Terry v. Ohio*, 392 U.S.1 (1968); *Reid v. Georgia*, 448 U.S. 438 (1980); *United States v. Sokolow*, 490 U.S. 1 (1989); and (3) physical arrests, which must be supported by probable cause. *See generally United States v. Johnson*, 326 F.3d 1018, 1021 (8th Cir.), *cert. denied*, 124 S. Ct. 425 (2003).

"[A] seizure does not occur simply because a police officer approaches an individual and asks a few questions. So long as a reasonable person would feel free 'to disregard the police and go about his business,' *California v. Hodari D.*, 499 U.S. 621, 628 (1991), the encounter is consensual and no reasonable suspicion is required." *Florida v. Bostick*, 501 U.S. 429, 434 (1991) (parallel citation omitted). Mere police questioning does not constitute a seizure. *Id*.

> In *Florida v. Royer,* 460 U.S. 491, [497] (1983) (plurality opinion), for example, we explained that "law enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting questions to him if the person is willing to listen, or by offering in evidence in a criminal prosecution his voluntary answers to such questions."

*Id*. (parallel citation omitted). *Accord United States v. Barry*, 394 F.3d 1070, 1074 (8th Cir. 2005).

> When conducting this analysis, "[e]xamples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." [*United States v. Mendenhall,* 446 U.S. 544, 554 (1980)]. "In the absence of some such evidence, otherwise inoffensive contact between a member of the public and the police cannot, as a matter of law, amount to a seizure of that person." *Id.* at 555. Whether a police officer

> subjectively believes he has detained an individual has little or no influence on our Fourth Amendment analysis, as we are called upon to "examine the facts and circumstances at the time from [the defendant]'s perspective as a reasonable person being questioned." *United States v. Garcia,* 197 F.3d 1223, 1226 (8th Cir. 1999).

*United States v. Barry*, 394 F.3d at 1075 (parallel citations omitted).

In this case, the court must determine whether the contact between the defendant and Deputy Maddux was consensual and when the encounter became non-consensual. If the conversation and search of the vehicle were consensual, no constitutional violation occurred. As counsel observed during oral argument, this determination depends on the credibility of the various witnesses.

The court finds Deputy Maddux's version of events to be more credible than that of the defendant and his father. Although Juan Vera testified that his primary language is Spanish, he admitted he has been living in the United States for at least 14 years and completed school in California through the 12th grade. For that reason, I credit Maddux's assessment that Juan was able to speak English and understood what was said during their conversation.

Juan Vera's version of events generally tracks that of Deputy Maddux. The main difference is that Vera described Maddux as speaking in an commanding, authoritative, or loud tone of voice. Vera also complained that Maddux was not nice or kind to them and had a "very bad attitude." (119:16). Angel Vera testified that he was reclining in the driver's seat, asleep, when Maddux knocked on the car window. Angel woke up, rolled down the

window, and, answering Maddux's question, said he did not speak English. He indicated to Maddux that his son, Juan, did speak English. Angel recalled that Maddux pointed at Juan, at which point Juan got out of the Grand Prix and went to the patrol car. Angel did not understand the conversation, in English, between Maddux and Juan. He described Maddux as being angry and loud and concluded that Maddux commanded Juan to get out of the car because Maddux had pointed at Juan. As to Juan's conversation with Maddux in the patrol car, which Angel could not hear (and would not have understood if he could have heard it), Angel concluded it was an argument because Maddux was waving his hands around. Neither Juan nor Angel testified as to how Maddux obtained the keys to the Grand Prix automobile or how the automobile came to be searched.

I find that Maddux's conduct in approaching the parked Grand Prix and knocking on the window did not amount to a "show of authority" such that a reasonable person would believe he was not at liberty to ignore the deputy's presence and go about his business. *See United States v. Barry*, 394 F.3d at 1075. Although the defendant and his father may have perceived Maddux as loud and unkind, their testimony does not suggest that the defendant's will was somehow overborne due to Maddux's conduct, forcing him to converse with Maddux, exit the automobile, and offer to let Maddux search the Grand Prix. *See United States v. Syslo*, 303 F.3d 860, 865-66 (8th Cir. 2002) (To determine whether a waiver was voluntary, the court considers the totality of the circumstances and must determine whether the individual's will was overborne.). I find that the actions of Juan Carlos Vera were

-14-

voluntary and that the search of the Grand Prix automobile was conducted pursuant to Vera's voluntary consent.

For these reasons,

**IT IS RECOMMENDED** that defendant's Amended Motion to Suppress [32] be denied.

Pursuant to NECrimR 57.3, a party may object to this Report and Recommendation by filing a "Statement of Objection to Magistrate Judge's Recommendation" within ten (10) days after being served with the recommendation. The statement of objection shall specify those portions of the recommendation to which the party objects and the basis of the objection. The objecting party shall file contemporaneously with the statement of objection a brief setting forth the party's arguments that the magistrate judge's recommendation should be reviewed *de novo* and a different disposition made.

**DATED May 13, 2005.**

          **BY THE COURT:**

          **s/ F.A. Gossett**
          **United States Magistrate Judge**